## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ALBERTO J. PEREZ A/K/A JUAN PABLO GONZALEZ-SOTO,<br><br>Defendant. | Civil Action No.<br>1:23-cr-00168-SDG-CMS |

### OPINION AND ORDER

This matter is before the Court on Defendant Juan Pablo Gonzalez-Soto's motion to suppress [ECF 35]. The Court held an evidentiary hearing on the motion on December 4, 2023. Both parties filed post-hearing briefs. After careful consideration, the Court **DENIES** Gonzalez-Soto's motion.

I.    **Background**[1]

A.    **The April 11 undercover buy**

Based on information received from a confidential informant, the Drug Enforcement Agency (DEA) learned that a suspected drug dealer sought to sell a batch of crystal methamphetamine.[2] In April 2023, the DEA arranged (via the same confidential informant) to purchase two kilograms of meth from the dealer using

---

[1]    This Order relies on evidence submitted by both parties as well as the testimony elicited during the December 4 evidentiary hearing. To the extent such evidence is controverted, this Order reflects the Court's factual findings solely for purposes of resolving this suppression motion.

[2]    ECF 42, at 64.

a cooperator—the "buyer."[3] The transaction was to occur on the evening of April 11.[4] The dealer informed the confidential informant that he would be sending his courier to the sale location, and asked for a photograph of the buyer's car.[5]

At approximately 6:30 PM, a blue Chevy Malibu arrived at the location and parked next to the buyer's car.[6] The courier exited the Malibu, walked up to the buyer's car, placed the two kilos of meth in the buyer's vehicle, accepted $4,800, and returned to the Malibu.[7] This interaction was captured by audio/visual devices in the buyer's car, which live-streamed the transaction to DEA agents.[8] The courier was later identified as Gonzalez-Soto.

After the sale, the agents followed Gonzalez-Soto. He drove to an apartment building located at 6906 Shenandoah Trail in Austell, Georgia (hereinafter, the Apartment).[9] Once Gonzalez-Soto entered the building, the agents lost visual surveillance and could not see which apartment he entered.[10] Approximately ten minutes later, Gonzalez-Soto and an unknown female exited the building and

---

[3]   *Id*. at 64–65.

[4]   *Id*.

[5]   *Id*. at 66.

[6]   *Id*.

[7]   *Id*. at 66–68.

[8]   *Id*. at 66–67.

[9]   *Id*. at 68-69.

[10]   *Id*.

drove to 4200 Kings Highway, Douglasville, Georgia, a DEA-suspected meth conversion lab.[11] The agents then ended their surveillance for the evening.

### B.    The Investigation

After observing Gonzalez-Soto participate in the April 11 drug transaction, agents began an investigation, first seeking to identify him. DEA agents checked the Malibu's registration information and cross referenced the owner's name, A.V., on social media.[12] Pictures of Gonzalez-Soto appeared on A.V.'s Facebook profile and the agents, based on their observations from the prior evening, recognized Gonzalez-Soto as the April 11 drug courier.[13] The agents also showed a photo of Gonzalez-Soto to the cooperating defendant, who confirmed that the photo was of the man who sold him the drugs the prior evening.[14]

On April 14, the DEA served a subpoena on the leasing office for the Apartment seeking "all apartment rental records of any apartments rented by Occupants of building #6906" for the month prior.[15] These records resulted in the

---

[11]   *Id*. at 69–70. 4200 Kings Highway was a suspected meth conversation lab based on a previous investigation not connected to Gonzalez-Soto.

[12]   *Id*. at 69.

[13]   *Id*. at 69–70.

[14]   *Id*. at 70.

[15]   ECF 38-3.

agents receiving the lease agreement for Juan Gonzalez and A.V., who rented the Apartment.

Agents conducted physical surveillance on Gonzalez-Soto following the April 11 transaction. In furtherance of their investigation, agents used a company called Flock, a license-plate-reader data company, to assist them with their surveillance. Flock provides a system of cameras that are posted around cities and counties to capture license plate numbers of passing cars. The agents used the system, in conjunction with physical surveillance on Gonzalez-Soto, to confirm that Gonzalez-Soto traveled frequently between the Apartment and the 4200 Kings Highway location, the latter of which was the Malibu's registered motor vehicle address.[16]

On April 17, the DEA arranged for a second transaction using the *same* confidential informant contacting the *same* alleged drug dealer requesting the *same* drug, this time for five kilos.[17] The dealer confirmed to the confidential informant that he would send the courier to a specific location the following afternoon.[18]

---

[16]   ECF 53.

[17]   ECF 42, at 72.

[18]   *Id.*

### C.    The April 18 traffic stop

On the morning of April 18, the DEA conducted a law enforcement briefing, which included DEA agents, Georgia Department of Public Safety Officer Micahiah Swain, Swain's supervisor, and Swain's on-call partner, Trooper Bailey.[19] During the briefing, the agents discussed the details of the April 11 transaction, Gonzalez-Soto's car and physical appearance, and the transaction set up for later that afternoon.[20] The plan was for Officer Swain to conduct a traffic stop if Gonzalez-Soto was observed leaving his apartment around the time of the scheduled transaction carrying any package of suspicion.[21]

Agents reestablished surveillance on Gonzalez-Soto that afternoon at the Apartment.[22] He first went to a laundromat with two females.[23] While at the laundromat, the agents had the confidential informant notify the dealer that the purported buyer was thirty minutes away from the location.[24] Fifteen minutes later, Gonzalez-Soto left the laundromat and returned to the Apartment.[25] At 4:03

---

[19]    *Id.*

[20]    *Id.* at 73.

[21]    *Id.*

[22]    *Id.* at 72.

[23]    *Id.*

[24]    *Id.* at 74–75.

[25]    *Id.* at 75; ECF 41-10.

PM, the confidential informant conveyed to the drug dealer that the buyer was five minutes from the location.[26] Two minutes after that message was passed, Gonzalez-Soto quickly exited the Apartment with an opaque bag in his hand, placed it on the floorboard of the front passenger's side of the Malibu, and began driving in the direction of the transaction location, which was approximately two miles from the Apartment.[27]

DEA agents, specifically Agent Danya Johnson, followed Gonzalez-Soto briefly until he was able to ensure Gonzalez-Soto was in range of Officer Swain, who planned to conduct the traffic stop.[28] When Gonzalez-Soto had nearly reached the transaction location,[29] Officer Swain observed Gonzalez-Soto driving in the opposite lane.[30] Officer Swain then u-turned, engaged his lights, and pulled Gonzalez-Soto's car to the side of the road.[31] The record includes various justifications for the traffic stop. Officer Swain testified that he observed Gonzalez-Soto holding his phone (in violation of Georgia law), while another report

---

[26] ECF 41-12, at 4.

[27] ECF 42, at 75; ECF 41-12, at 4.

[28] *Id.*

[29] *Compare* ECF 41-12, at 3, *with* ECF 42, at 115 (showing approximate locations of the Apartment, the meet-up location, and the location of the stop).

[30] ECF 42, at 12.

[31] *Id.*

indicates that Gonzalez-Soto was pulled over for failure to maintain his lane, and yet another states that Gonzalez-Soto had his phone to his ear. The dash cam footage is inconclusive, but Agent Johnson confirmed that they planned to stop Gonzalez-Soto regardless of whether he committed a traffic violation.[32]

Officer Swain approached the vehicle and asked Gonzalez-Soto for his license.[33] Gonzalez-Soto said he did not have it.[34] He then stepped out of the vehicle, was searched for weapons, and detained while Officer Swain determined whether Gonzalez-Soto had a driver's license issued in his name.[35] Officer Swain's partner, Trooper Bailey, arrived shortly thereafter. By this point, Officer Swain had confirmed that Gonzalez-Soto did not have a driver's license whatsoever, placed him under arrest, and told him that his car would be towed.[36]

Officer Swain then asked Trooper Bailey to conduct an inventory search of Gonzalez-Soto's vehicle.[37] During that search, Trooper Bailey discovered that the bag on the passenger floorboard contained approximately five kilos of meth.[38]

---

[32]   *Id.* at 110–11.

[33]   ECF 41-2, at 3.

[34]   *Id.*

[35]   *Id.*

[36]   ECF 42, at 18–19.

[37]   *Id.* at 55.

[38]   ECF 41-2, at 3.

While Trooper Bailey searched inside the Malibu, Sergeant Michael Allen arrived and began photographing inside the vehicle.[39] The photos show the following items in addition to the drugs: multiple sets of car keys, multiple cell phones, cigarettes, documents (including insurance paperwork), a copy of a "Cielo at Vinings" welcome letter, a rosary, a cell phone mount, clothing, a laundry basket, and laundry detergent.[40] The inventory list, located at the bottom of the tow receipt, lists only "misc clothing" and "laundry detergent."[41]

### D.   The April 18 search of the Apartment

Once Agent Johnson confirmed that the stop was imminent, he returned to the Apartment, about two miles from where the traffic stop took place.[42] On a WhatsApp chat, another agent assisting with the investigation confirmed that law enforcement planned to enter the Apartment as soon as drugs were found in Gonzalez-Soto's vehicle during the traffic stop.[43]

The agents at the apartment complex knew that at least two females were inside the Apartment, and Agent Johnson testified that he was concerned about

---

[39]   ECF 42, at 19.

[40]   ECF 53, at 5.

[41]   ECF 64-5.

[42]   ECF 42, at 75.

[43]   ECF 41-12, at 4 ("Once we confirm the meth is in the car we'll move in to secure the residence").

the destruction of evidence given that Gonzalez-Soto was allegedly seen on his phone prior to the traffic stop.[44] Thirty minutes after the traffic stop began (and thus, thirty minutes after Gonzalez-Soto had access to his phone), the agents were sent a photo by text in WhatsApp, which the Court finds likely indicated that drugs were found in the vehicle.[45] At that point, agents knocked on the door of the Apartment, removed the two females from inside, and entered.[46] They conducted what they referred to as a "protective sweep," looking for other individuals in the Apartment.[47] During the sweep, they encountered a locked door. The agents forced the door open. Inside, they found several boxes, heating lamps, and plastic bags that they believed were indicative of drug activity.[48] The agents then brought the females back into the Apartment and waited there while Agent Johnson completed and submitted the search warrant.[49] Agent Johnson testified that, prior to the initial entry into the Apartment, he was nearly finished with the warrant affidavit and added an additional two paragraphs after the entry, which included

---

[44]   ECF 42, at 76.

[45]   ECF 41-12, at 5; ECF 42, at 118–19.

[46]   ECF 42, at 76.

[47]   *Id.*

[48]   *Id.* at 107.

[49]   *Id.* at 77.

information about the drugs found during the traffic stop and the contents observed behind the locked door during the security sweep.[50]

A search warrant issued two hours after the initial entry into the Apartment.[51] During the post-warrant search of the Apartment, agents seized 11.4 kilos of crystal meth, $35,900 in currency, and three ledgers. Gonzalez-Soto is charged with three counts of possession with the intent to distribute a controlled substance.[52]

## II.   Discussion

Gonzalez-Soto moves to suppress the physical evidence found in the Apartment and his vehicle, digital evidence gathered using the Flock license plate reader system, and identification testimony from the cooperating defendant. The Court need not address the motion to suppress identification testimony because the government has indicated it will not call the cooperating defendant as a witness at trial.[53] The Court addresses Gonzalez-Soto's remaining arguments in turn.

---

[50]   *Id.* at 78–79.

[51]   *Id.* at 79.

[52]   ECF 1.

[53]   Gonzalez-Soto did not oppose the government's position that this portion of his motion is now moot. Gonzalez-Soto is granted leave to renew this portion of his motion if he believes it remains ripe for adjudication.

**A.**   **The stop of Gonzalez-Soto's vehicle was predicated on probable cause, both that he had completed a felony and that he was currently engaged in a drug trafficking offense; the vehicle search was predicated on probable cause that it contained evidence of the ongoing drug trafficking offense.**

Gonzalez-Soto argues that the traffic stop conducted by Officer Swain was unlawful since he lacked reasonable suspicion and thus, the evidence recovered pursuant to the stop must be suppressed. The parties extensively debate the veracity of Officer Swain's justification for conducting the stop—that he observed Gonzalez-Soto with a phone in his hand. Gonzalez-Soto argues that Officer Swain's testimony is untrustworthy due to various inconsistencies in police reports and based on the dash cam footage of the stop.[54] He then argues that the ensuing vehicle search was an unconstitutional inventory search.[55] The

---

[54] ECF 46-1, at 4–15. The Court shares Gonzalez-Soto's concerns about the inconsistent law enforcement narratives pertaining to the stop and search of the vehicle. For example, during the preliminary hearing, Agent Johnson testified that the drugs were found in plain view and barely covered by a towel. Not so. Then, during the evidentiary hearing, Officer Swain claimed he could not recall if Gonzalez-Soto's name was ever provided to him even though he attended a briefing earlier that day and was added to a WhatsApp chat titled "GONZALEZ-6909 Shenandoah/4200 Kings."

[55] Though ultimately irrelevant here, the Court agrees with Gonzalez-Soto that the government's reliance on the inventory search exception is problematic for a number of reasons. First, it is not clear that Gonzalez-Soto's car needed to be towed in the first place. Second, it is equally not clear that the Georgia Department of Public Safety has constitutionally sufficient standardized policies and procedures for conducting inventory searches, a copy of which was not even tendered by the government during the evidentiary hearing, and only provided after the Court asked for it specifically. Finally, even assuming GDPS's policies and procedures are sufficient, there is no evidence in the

government's response is two-fold. First, it argues that Officer Swain did in fact have reasonable suspicion for the stop because he observed Gonzalez-Soto on his phone while driving, which violates Georgia's traffic laws.[56] Second, it argues that the stop was independently justified based on reasonable suspicion that Gonzalez-Soto had violated and was violating drug trafficking laws.[57] In its response to the Court's February 8, 2024 Order, the government for the first time argues, in the alternative, that there existed probable cause to search the vehicle pursuant to the automobile exception to the warrant requirement.

1.    *Officer Swain had probable cause to stop Gonzalez-Soto.*

The Court finds that there was not only reasonable suspicion (as the government argued), but probable cause to stop Gonzalez-Soto's vehicle.

A warrantless arrest (and thus, seizure) of an individual in public is permitted where there is probable cause to believe that the individual has committed a felony. *United States v. Watson*, 423 U.S. 411 (1976). Probable cause

---

record to support the conclusion that the law enforcement officers charged with conducting the inventory search actually followed those policies and procedures. In fact, to the contrary: multiple valuable items found in the car were inexplicably omitted from the purported "inventory" list. If the government's arguments were exclusively dependent on a finding that law enforcement conducted nothing more than an inventory search on Gonzalez-Soto's car during the traffic stop, it would lose.

[56]   ECF 49, at 12–13.

[57]   *Id.* at 13–14.

exists when "the facts and circumstances within the officers' knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Miller v. Harget*, 458 F.3d 1251, 1259 (11th Cir. 2006) (quoting *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998)). Additionally, law enforcement officers may detain a person briefly for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity. *Terry v. Ohio*, 392 U.S. 1, 20 (1968).

The totality of the circumstances here gave rise to probable cause that Gonzalez-Soto was involved in a completed felony. During the April 11 transaction, DEA agents used a confidential informant to set up a meth purchase. Agents observed Gonzalez-Soto during the transaction, driving the same blue Chevy Malibu in which he was pulled over, deliver two kilos of meth to the cooperator. Their investigatory work following that transaction identified Gonzalez-Soto as the courier. This sufficiently gave rise to probable cause that Gonzalez-Soto previously committed a felony.[58]

---

[58] Law enforcement may rely on their collective knowledge to establish reasonable suspicion or probable cause, so any argument that Officer Swain lacked it himself fails. *See United States v. Acosta*, 363 F.3d 1145 (11th Cir. 2004).

The officers also had probable cause to believe that a crime was presently afoot or imminent. The agents arranged for a second transaction to occur the afternoon of April 18. They utilized the *same* confidential informant, who contacted the *same* alleged drug dealer, and arranged (substantively) the *same* plan as April 11. Agents were surveilling Gonzalez-Soto throughout the day and his movements aligned with an apparent intent to execute the drug transaction. Prior to the meet up, Gonzalez-Soto was at a laundromat. Agents told the confidential informant to inform the dealer that he was thirty minutes out from the transaction location. Shortly after that text was sent, Gonzalez-Soto left the laundromat and returned to the Apartment. After briefly entering, he left with an opaque bag—one that appeared to be sufficiently the size needed to transport the drugs in question[59]—and began driving towards where the transaction was scheduled to take place. He was approximately one mile away when he was stopped. None of these singular facts alone necessarily meets the probable cause standard. But taken together, and especially considering the similarities between the first and second transactions, a prudent person would believe that there is at least a fair probability that Gonzalez-Soto both had previously engaged in, and was currently engaged in, a drug trafficking offense. Thus, the Court finds that the totality of the

---

[59]   ECF 41-8.

circumstances give rise to probable cause justifying the stop of Gonzalez-Soto's vehicle.[60]

2.   *Officers had probable cause to search Gonzalez-Soto's vehicle.*

The Court likewise finds that there was probable cause to search Gonzalez-Soto's vehicle without a warrant.

For a warrantless search of an automobile to be constitutional, (1) the automobile must be readily mobile, and (2) there must be probable cause to believe that it contains contraband or evidence of a crime. *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003). Probable cause to search exists when there is a fair probability that contraband or evidence of a crime will be found in the vehicle under the totality of the circumstances. *United States v. Tamari*, 454 F.3d 1259, 1264 (11th Cir. 2006). There is no dispute that the car was readily mobile. The Court also finds that, for the reasons just described, there was a fair probability that contraband or evidence of a crime would be found in the vehicle. Gonzalez-Soto's actions aligned perfectly with the planned transaction. Leaving his apartment with a bag, placing that bag in his vehicle, and then heading exactly towards the meetup location gave officers additional probable cause to believe that a search of the

---

[60]   Because the Court concludes that there was probable cause to stop and arrest Gonzalez-Soto, it need not address whether there were alternative grounds to stop him based on Officer Swain's stated observation of a traffic violation.

vehicle would reveal evidence of a drug trafficking offense. Because the officers had probable cause for both the stop and search of the vehicle, no evidence obtained therefrom must be suppressed.

**B.    No exception justifies the warrantless search of the Apartment, but the evidence found therein need not be suppressed.**

The government argues that two warrant exceptions justify the pre-warrant entry into the Apartment. The Court disagrees. Nonetheless, because an exception to the exclusionary rule applies, the evidence seized there need not be suppressed.

1.    *The entry was not justified based on the exigency exception.*

Exceptions to the warrant requirement are generally based on exigency principles. The term "exigent circumstances" refers to a situation where the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action. *United States v. Burgos*, 720 F.2d 1520, 1526 (11th Cir. 1983). An exigent situation may arise, for example, when there is danger that the evidence will be destroyed or removed. *Burgos*, 720 F.2d at 1526.

Agent Johnson claims that the initial entry into the Apartment was based on the need to prevent the destruction of evidence. Ostensibly, the concern was that, immediately prior to the traffic stop, Gonzalez-Soto had placed a call or sent a text message to someone in the Apartment to ask them to remove or destroy incriminating evidence. According to Agent Johnson, information was passed to him that Gonzalez-Soto was seen on the telephone immediately prior to the traffic

stop, at 4:10 PM.[61] Agent Johnson apparently knew there were two individuals in the Apartment. This, combined with Agent Johnson's law enforcement experience of having "personally seen people flush" drugs down toilets, is the totality of the alleged exigent circumstances that purportedly justified the agents' initial entry into the Apartment. The timeline established by the record, however, belies this explanation.

Central to any exigency-based search is the immediacy of the police action that would otherwise require a warrant. But Agent Johnson did not immediately enter the Apartment after learning that Gonzalez-Soto was handling his phone prior to the traffic stop. Officer Swain testified that he alerted the team when he began the stop and noted that he saw Gonzalez-Soto with a phone in his hand.[62] According to the WhatsApp Chat messages, at 4:16:34 PM, "J. Jones" noted that the traffic stop began "about 5 minutes ago."[63] *Ten minutes later*, Officer Jones confirmed that, *as soon as the officers saw drugs in the vehicle*, the agents would "move in to secure the residence."[64] At 4:38:15 PM, Agent Gray confirmed he had secured

---

[61]   ECF 41-2, at 2.

[62]   The Court accepts this as true for the sole purpose of addressing the government's argument.

[63]   ECF 41-12, at 4.

[64]   *Id*.

a key to the Apartment and was heading that way.[65] Another agent then confirmed that two females were in custody by 4:39:15 PM.[66] Thus, an entire half hour elapsed between Agent Johnson learning that Gonzalez-Soto was seen with a phone in his hand and the entry itself. If this was a true exigency-based argument, the agents should have immediately secured the residence once they believed that destruction of evidence was imminent.[67] As the half hour passed, so too did any potentially exigent circumstances.

One important point of clarification. The initial entry into the Apartment may not have passed constitutional muster even had the agents entered immediately after learning that Gonzalez-Soto was on the phone. While destruction of drugs can create an exigent circumstance, the facts here are too attenuated and speculative to warrant such a conclusion. The government provided no authority and the Court's independent research revealed none suggesting that circumstances analogous to those here rise to the level of an exigency justifying a warrant exception.

---

[65] *Id*. at 5.

[66] *Id*.

[67] Once Officer Swain stopped Gonzalez-Soto and began interacting with him, the potential phone-created exigency disappeared because Gonzalez-Soto was no longer interacting with his phone. It was eventually seized.

Officer Jones's text after the stop (i.e., after the agents knew Gonzalez-Soto was seen holding a phone) confirming the plan to secure the apartment only *after* drugs were found in the vehicle vitiates any exigency-based argument. First, it reveals that the plan was never really based on any exigency created by the phone. Second, the discovery of drugs in the vehicle does not independently create the exigency. At bottom, the record here does not support a finding that exigent circumstances arose justifying the warrantless entry into Gonzalez-Soto's apartment at any time, much less thirty minutes after the purported exigency occurred.

2. *The entry was not justified under the protective sweep exception.*

Nor was the warrantless search justified as a protective sweep. Incident to an arrest, officers are permitted "as a precautionary matter and without probable cause or reasonable suspicion" to perform a limited "protective sweep" of areas "immediately adjoining the place of arrest from which an attack could be immediately launched." *Maryland v. Buie*, 494 U.S. 325, 334 (1990). In the Eleventh Circuit, officers can conduct a protective sweep if they are **lawfully within the premises** due to the existence of exigent circumstances. *United States v. Caraballo*, 595 F.3d 1214, 1224–25 (11th Cir. 2010). The protective sweep doctrine does not provide an independent basis upon which officers can justify a warrantless entry into a home. Because the Court has already determined that the officers were not

lawfully permitted to enter the Apartment, the protective sweep doctrine does not apply and thus cannot render the warrantless entry constitutionally permissible.

3.    *The evidence in Gonzalez-Soto's home need not be suppressed.*

Having determined that the initial search of Gonzalez-Soto's home violated the Fourth Amendment, the Court must now determine whether the results of the subsequent search, conducted after the warrant was finally obtained, should be suppressed as fruit of the poisonous tree. Where a search warrant affidavit is based on information acquired as a result of an illegal entry, the Court must look to whether the other information provided in the affidavit is sufficient to support a probable cause finding. *United States v. Glinton*, 154 F.3d 1245, 1254–55 (11th Cir. 1998). If the non-spoiled evidence establishes probable cause, then suppression is not appropriate because "the exclusionary rule has no application where the government learned of the evidence from an independent source," *id.* at 1255, assuming that "the agents' decision to seek the warrant was [not] prompted by what they had seen during the initial entry." *Murray v. United States,* 487 U.S. 533, 542 (1988).

Here, the probable cause portion of the affidavit upon which the search warrant was based contained fifteen substantive paragraphs.[68] Of those

---

[68]    ECF 41-9.

paragraphs, only 1.5 pertain to the unlawful initial apartment entry.[69] Even if the Court excises these portions of the affidavit, probable cause still exists and thus, the Court finds that the warrant would have justifiably been issued even without the inclusion of the tainted evidence.

Second, the chronology in the record demonstrates that Agent Johnson was not prompted to seek a warrant based on what was found during the initial entry. As previously referenced, the majority of the affidavit was based on the agent's earlier surveillance efforts, information from the confidential informant, and the drug transaction that took place on April 11. Agent Johnson credibly testified that, prior to arriving at the Apartment for the initial entry, he was "97, 98 percent finished" with the warrant preparation.[70] Agent Johnson confirmed that he only needed to add the "last . . . paragraph and a half."[71] The affidavit itself confirms his testimony. Because the warrant was nearly complete prior to the unauthorized search, the Court concludes that the agents' decision to seek the warrant was not based on what they observed during the initial entry into the Apartment. Because the Court finds that the search warrant could have been issued even without the

---

[69]   *Id*. at 21–22.

[70]   ECF 42, at 79.

[71]   *Id*.

inclusion of the spoiled evidence,[72] the Apartment would have been searched and the contraband would have inevitably been discovered pursuant to an independent lawful process, i.e., the search warrant. Thus, no evidence from the Apartment needs to be suppressed.

### C.  The DEA's use of license plate reader (LPR) data did not run afoul of the Fourth Amendment.

Gonzalez-Soto moves to suppress all digital evidence gained through the DEA's use of Flock data. The thrust of Gonzalez-Soto's argument is that the government's use of the data constitutes a form of tracking that was rendered unconstitutional by *Carpenter v. United States*, 585 U.S. 296, 300 (2018). The Court finds that the government's use of the LPR data in this case did not constitute a search.[73]

---

[72] Gonzalez-Soto argues that the warrant was partially based on misstatements and omissions. ECF 46-1, at 40–41. The Court finds that the omissions and misstatements identified in the warrant, even assuming Gonzalez-Soto is correct, do not render the warrant invalid, nor the search predicated on the warrant unconstitutional.

[73] The government argues that, because the vehicle was owned by Gonzalez-Soto's wife, he had no reasonable expectation of privacy in the vehicle and thus, no standing to challenge the LPR search. The Court is not persuaded. It is possible to develop a reasonable expectation of privacy in property you do not own if you can establish a sufficient connection to the property. *See Minnesota v. Olson*, 495 U.S. 91 (1990) (holding overnight guest in duplex had a reasonable expectation of privacy in the premises and, thus, had standing to challenge his warrantless arrest). Here, even though Gonzalez-Soto did not own the vehicle, he nevertheless has standing to challenge the use of LPR data because he shared the vehicle with A.V. and was at least closely enough

Supreme Court "tracking" precedent, for our purposes, begins with *United States v. Knotts,* 460 U.S. 276 (1983). There, law enforcement officers placed a tracking device in a product that was picked up by the target and placed in his vehicle. The police were able to track the device, and thus, the defendant's movements. The Court concluded that people have no reasonable expectation of privacy in their "movements from one place to another," given that they "voluntarily conveyed [them] to anyone who wanted to look." *Id.* at 281–82. But the *Knotts* Court noted that, if "dragnet type law enforcement practices . . . should eventually occur," then "different constitutional principles may be applicable." *Id.* at 284. The crux in *Knotts* was that the device only augmented, to a permissible degree, warrantless capabilities the police possessed even before the technology existed.

Then, in *United States v. Jones,* 565 U.S. 400 (2012), police used a GPS-tracking device to remotely monitor and record a vehicle's movements over 28 days. Although the case was ultimately decided on trespass principles, five Justices agreed that "longer term GPS monitoring . . . impinges on expectations of privacy." *Id.* at 430 (Alito, J., concurring). The Justices reasoned that "society's expectation" was that police would not "secretly monitor and catalogue every

---

connected to it that the investigating agents found it necessary to run a LPR search on the car in the first place.

single movement of an individual's car for a very long period." *Id.; see also id.* at

415 (Sotomayor, J., concurring).

*Carpenter* addressed a new scenario: the ability to chronicle a person's past

movements through the record of his cell phone signals. At issue was six-days'

worth of cell site location data (CSLI), which the government collected from the

defendant's cell phone company. The court determined that collection of the data

was a search. The court identified "a reasonable expectation of privacy in the

whole of [a person's] physical movements," and held that "government access to

[CSLI] contravenes that expectation." *Carpenter*, 585 U.S. at 297 ("A person does

not surrender all Fourth Amendment protection by venturing into the public

sphere."). CSLI data, over time, "provides an all-encompassing record of the

holder's whereabouts," and such a "deep repository of historical location

information" opens "an intimate window into a person's life." *Id.* at 311. The Court

took specific issue with the "retrospective quality" of CSLI because it enables the

government to "travel back in time to retrace a person's whereabouts," granting

access "to a category of information otherwise unknowable." *Id.* at 312.

*Carpenter* makes clear that there is a difference between short-term tracking

of public movements—analogous to what law enforcement could do prior to the

digital age—and prolonged tracking that can reveal information through habits

and patterns. *See id.* The latter may violate the reasonable expectation of privacy

24

that individuals have in the whole of their movements because it reveals details greater than the sum of any one trip. *Id.* at 310. ("[L]aw enforcement might have pursued a suspect for a brief stretch, but doing so 'for any extended period of time was difficult and costly and therefore rarely undertaken' . . . [and] attempts to reconstruct a person's movements were limited by a dearth of records and the frailties of recollection.") (citations omitted). *Carpenter* did not overrule *Knotts*, but the *Carpenter* Court observed that *Knotts* had been "careful to distinguish between the rudimentary tracking facilitated by the beeper and more sweeping modes of surveillance." *Id.* at 306.

District courts in this Circuit have addressed the use of LPR data in numerous cases, but with respect to only one, real-time LPR data point. For example, in *United States v. Toombs*, 671 F. Supp. 3d 1329, 1340 (N.D. Ala. 2023), the court held that the defendant had no reasonable expectation of privacy in the information stored in an automated license plate reader database, which provided a snapshot of the defendant's location at a discrete time while traveling in his vehicle on a public road. The limited, real-time use of the data was a distinguishing factor for the court: "[the agent's] use of the [LPR] system is a far cry from the 24-hour surveillance at issue in *Carpenter*." *Id.* at 1333. *See also United States v. Wilcox*, No. 1:08-CR-459-BBM-ECS, 2009 WL 10671540, at *2 (N.D. Ga. Dec. 22, 2009), *report and recommendation adopted*, No. 108CR00459JOFECS, 2010 WL 11527193 (N.D. Ga.

Jan. 27, 2010), and *aff'd*, 415 F. App'x 990 (11th Cir. 2011) ("[T]he information obtained from the license plate was captured by the tag reader technology while the vehicle was on the public roads. The officers' vehicle was legally in a place where it was permitted to be and where the cameras were able to capture the tag without intruding into any private space. The tag information was thus in plain view when it was captured by the cameras.").

So, courts today are forced to draw the line between sweeping modes of surveillance that allow law enforcement officers to track an individual's every move and more discrete uses of technology that simply augment ordinary police capabilities. The Court finds that the DEA's use of the LPR data in this case constituted the latter and did not constitute a search.

But first, the Court notes that the cases identified by the government are inapposite as they are not fundamentally about tracking or surveillance. Some are pre-*Carpenter* and deal with one LPR alert in real time, not numerous LPR data queries used to find an individual. The use of LPR technology as a general matter is not at issue here. Nor is the Court questioning whether one has a reasonable expectation of privacy in a license plate itself—we do not. At issue is the use of LPR technology to track a target's movements so closely that what results is essentially a map of a target's movements. It bears repeating: A person does not surrender all Fourth Amendment protections by venturing into the public sphere.

In this case, agents used the Flock data to either confirm information they had already obtained or augment their ongoing surveillance. Based on the Court's understanding, the data was not used to create a map of Gonzalez-Soto's movements, but rather to confirm the frequency with which he visited two locations that agents had already identified as pertinent to their investigation. For example, after the April 11 drug transaction, agents followed Gonzalez-Soto to both the Apartment and then to 4200 Kings Highway. Sometime that evening, DEA intelligence analysts ran a Flock search, which returned approximately 446 "earlier-in-time" LPR data hits on Gonzalez-Soto's license plate.[74] However, based on the Court's understanding, the data was used to confirm that Gonzalez-Soto traveled frequently between these two addresses—which agents had already identified—not to create a map of his movements otherwise. And, on April 17, agents used the LPR data "to determine how best to allocate resources to surveil the defendant."[75] It seems that the discrete LPR searches were used to locate Gonzalez-Soto at specific times to allow DEA agents to pick up their physical surveillance of him between April 11 and 18. Agents were running LPR data searches in conjunction with a significant amount of physical surveillance to assist their efforts. And importantly, agents had already identified the two locations of

---

[74]   ECF 53, at 13.

[75]   *Id*. at 15.

interest through their own physical surveillance. While the use of LPR data was certainly more robust than a singular real-time LPR hit, agents did not use the data to retroactively create a map of Gonzalez-Soto's past whereabouts or "secretly catalogue" his every movement. Such a robust and retroactive use of LPR data may in some scenarios be problematic after *Carpenter*, but here, the Court finds that the use of Flock data did not rise to the level of a search and thus, the digital evidence resulting from its use need not be suppressed.

### D. Gonzalez-Soto has no expectation of privacy in his apartment number.

Although abandoned in his post-hearing brief, the Court will briefly address Gonzalez-Soto's initial motion to suppress the apartment lease and other data obtained pursuant to an administrative subpoena. Gonzalez-Soto argues that the DEA violated his Fourth Amendment rights by issuing an administrative subpoena on Cielo, the company that owns or manages the Apartment. Through these records, the DEA learned that Gonzalez-Soto and A.V. leased the Apartment. The third-party doctrine is implicated by Gonzalez-Soto's motion.

The third-party doctrine states that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Carpenter*, 585 U.S. at 308 (citing *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979)). The apartment records in this case are similar to the bank records at issue in *United States v. Miller*, 425 U.S. 435 (1976). There, the Supreme Court held that a bank depositor had no

protectible Fourth Amendment interest in his bank records. "The [lessee] takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government." *United States v. White*, 401 U.S. 745, 751–52 (1971).

Such is the case here. When Gonzalez-Soto entered into a contract with Cielo, he assumed the risk that Cielo might reveal the details of that contract to the government. Gonzalez-Soto's motion to suppress in this regard is denied.

## III.   Conclusion

The Court **DENIES** Defendant Gonzalez-Soto's motion to suppress [ECF 35].

Within 7 days of this Order, the parties are **DIRECTED** to file a motion, if appropriate, seeking the continued sealing of the underlying motions, briefs, transcript, and exhibits underlying this Order, including: ECFs 35, 41, 42, 45, 46, 49, and 50. Absent a motion establishing good cause, the Court will direct that said items be unsealed.

**SO ORDERED** this 15th day of March, 2024.

_____
Steven D. Grimberg
United States District Judge

29